IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **UNDER SEAL** |
| | ) | |
| RICHARD ADJEI BRONI and | ) | Criminal No. 1:21-MJ-145 |
| LINDA MBIMADONG, | ) | |
| | ) | |
| Defendants. | ) | |

**AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Christopher Drew Truslow, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.  I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since September 15, 2019. I have received basic training at the FBI Academy in Quantico, Virginia. I am currently assigned to the FBI's Washington Field Office. As part of my assigned duties, I am responsible for conducting and assisting with securities fraud and investment fraud investigations, including related white-collar and financial crimes. As such, I have participated in investigations involving mail fraud, wire fraud, securities fraud, money laundering, obstruction of justice, and conspiracy. I have training and experience in the enforcement of the law of the United States. Prior to working for the FBI, I was a Department of Criminal Justice Services certified law enforcement officer in the Commonwealth of Virginia for fourteen years.

2.  I make this affidavit in support of a criminal complaint and arrest warrant charging that on or about September 1, 2019 through April 21, 2021, RICHARD ADJEI BRONI (BRONI) and LINDA MBIMADONG (MBIMADONG), and persons known and unknown to your affiant, in the Eastern District of Virginia and elsewhere, did knowingly combine and

1

conspire to commit offenses against the United States, to wit: wire fraud (18 U.S.C. § 1343), mail fraud (18 U.S.C. § 1341), money laundering (18 U.S.C. §§ 1956, 1957), and to make false statements to law enforcement officers (18 U.S.C. § 1001), all in violation of Title 18, United States Code, Section 371.

3. The facts described below were acquired as a result of a joint investigation by Special Agents of the FBI and the Fairfax County Police Department located in Fairfax, Virginia. The facts recited below are based on my personal knowledge of this investigation and the observations of other law enforcement officials, including a review of documents related to this investigation, witness interviews, and communications with others who have personal knowledge of the events and circumstances described herein. This affidavit is intended to merely show that there is probable cause for certain criminal activity and does not set forth all of my knowledge about this matter, nor does it describe all potential violations that I believe BRONI and MBIMADONG have committed.

## STATEMENT OF PROBABLE CAUSE

4. On or about April 24, 2020, a complaint was made to the FBI using the Internet Crime Complaint Center (iC3) on behalf of VICTIM #1, a 78-year-old male from Annandale, Virginia. The individual making the complaint was the son of VICTIM #1 (SON #1) who detailed approximately $421,310.88 of loss incurred by VICTIM #1 due to a romance scam.[1] During the same time period, a report was also filed by VICTIM #1 with the Fairfax County Police Department and assigned a detective to investigate the case.

---

[1] In reviewing all purchases by VICTIM #1 to include shipping fees for products bought and shipped at the direction of the underlying perpetrators, the total loss is estimated at $590,485.09.

2

5.  According to SON #1, during the duration of the scam, VICTIM #1 sent a female who assumed the name "███████"[2] (███████), or others at her direction, money, gift cards, and Apple products. VICTIM #1 used money from his bank accounts and approximately $394,000 out of his Individual Retirement Account (IRA) to send to ███████, or to others at her direction.

6.  On September 22, 2020, an FBI Agent spoke to another son of VICTIM #1, identified here as SON #2. Based on that conversation, on September 24, 2020, SON #2 provided the FBI Agent with numerous items related to the investigation, one of which was a chat conversation VICTIM #1 had with ███████ using Google Hangouts. That chat covered the period of time from September 6, 2019 through June 17, 2020, with VICTIM #1 stopping his responses on April 23, 2020.

7.  On September 25, 2020, an FBI Agent met with VICTIM #1 and SON #2 to discuss this apparent romance fraud. According to VICTIM #1 and SON #2, VICTIM #1 set up an iFlirt account on his cell phone. iFlirt is a phone application that you can sign up for using an email account address. According to their website, www.iflirt.site, iFlirt is an application used to "flirt and find your happiness." The application is free to use, and advertise that they use "an advance algorithm to match the perfect person." iFlirt also advertised that users can define their search criteria to be made by distance, age, or gender to find a match of their choice.

8.  According to VICTIM #1 and SON #2, communications with ███████ began on iFlirt but quickly went to email. Through this communication, VICTIM #1 was led to

---

[2] During the course of this investigation, the FBI has identified a woman involved in this scheme by the name of ███████ who lives in Watertown, New York. From the examination of bank records and an in-person interview of ███████ by the FBI, it appears the underlying perpetrators have used the name "███████" in order to perpetuate the scheme and to utilize the real ███████ as a money mule. In this document, any reference to ███████ is referring to the fictitious ███████, not the ███████ who lives in Watertown, New York.

3

believe ███████ was a widow from Watertown, New York in her thirties. This included ███████ sending a photograph to VICTIM #1 of a female matching the description previously provided to VICTIM #1.

9. According to VICTIM #1 and SON #2, ███████ instructed VICTIM #1 via email to begin communicating with her using Google Hangouts. According to hangouts.google.com, Google Hangouts is a cross-platform messaging application developed by Google and can be used to communicate with one person or a group using a mobile device or desktop. Google Hangouts also has the ability for video or voice calls to be made in addition to messaging.

10. As referenced in paragraph number six, SON #2 provided an FBI Agent with the Google Hangouts chat between ███████ and VICTIM #1 in its entirety ranging from September 6, 2019 to June 17, 2020.

11. In the Google Hangouts chat, ███████ described going to Germany in order to receive an inheritance of gold bars. While in Germany, ███████ was supposedly arrested, so that she requested money from VICTIM #1 for her release. ███████ put VICTIM #1 in touch with her "financial advisor," a person purportedly named ███████ (███). During the course of this scam ███████ promised VICTIM #1 all his money would be returned plus 30% for his trouble.

12. ███████ and ███ instructed VICTIM #1 to use his credit cards to purchase Apple products and then ship them to ███ at addresses provided by ███. ███████ told VICTIM #1 in the Google Hangouts chat that ███ would sell the Apple products and then send ███████ the money. ███████ explained to VICTIM #1 that he needed to purchase Apple products because VICTIM #1 could charge more on his credit card

than he was allowed to withdrawal in just cash. ▮▮▮▮ told VICTIM #1 in the chat the full credit limit of each credit card could be used instead of the minimal amount of cash allowed to be withdrawn on a credit card, thus giving her more money faster.

13. From October 22, 2019 until December 19, 2019, VICTIM #1 sent fifty-three packages from Virginia to New York containing Apple products purchased by VICTIM #1 intended to be received by ▮▮▮, via his company, COMPANY A.³  VICTIM #1 was informed that the Apple products would be sold, and the proceeds would go to ▮▮▮▮.

14. On October 31, 2019, ▮▮▮ sent VICTIM #1 an authorization form for COMPANY A which authorized COMPANY A to receive merchandise and deliver said merchandise to another person.

15. In order to get reimbursed for the money spent on the Apple products, at the direction of ▮▮▮, VICTIM #1 gave ▮▮▮ his usernames and passwords for his credit card accounts. This was purportedly so that ▮▮▮ could add bank accounts to pay for the charges accruing to the credit cards of VICTIM #1. However, the promised payments scheduled by ▮▮▮ were all rejected by the banks, which indicated that the payments were not authorized by the account holders. This left VICTIM #1 accountable to the credit card companies for the charges.

16. After VICTIM #1 provided enough money for the supposed purpose of getting ▮▮▮▮ released from jail, she then communicated to VICTIM #1 that she had been arrested again. Now, ▮▮▮▮ claimed that she needed more money for her second jail release and for insurance to ship the gold to the United States of America from the Netherlands.

---

³ It has been discovered during the course of this investigation COMPANY A is owned by CO-CONSPIRATOR #1, and that ▮▮▮▮ is likely a fictitious person.

5

17. Due to her claim of being arrested again, and supposedly needing to pay for the shipment of the gold and the insurance for the shipment, ███████ subsequently convinced VICTIM #1 to start giving her money from his IRA.

18. On March 10, 2020, at the instruction of ███████, VICTIM #1 obtained a cashier's check made payable to a BB&T Bank account held in the name of COMPANY B for $102,000. ███████ gave VICTIM #1 bank account information for COMPANY B to include a beneficiary address located in Randallstown, Maryland 21133, a bank account number, which ended in 4361, and a routing number. VICTIM #1 made two additional deposits into this same COMPANY B bank account: one on March 30, 2020 for $95,000 and one on April 7, 2020 for $115,000. For each deposit, VICTIM #1 traveled to a BB&T Bank branch and deposited the cashier's check into the account. For each deposit, using the Google Hangouts chat, VICTIM #1 kept ███████ updated on the process and then sent her a deposit receipt once the transaction was completed.

19. On March 14, 2020, VICTIM #1 was instructed by ███████ to wire $5,000 to a Chase Bank account held in the name of PACIFIC CAPITAL TRADING GROUP LLC. ███████ gave VICTIM #1 bank account information for PACIFIC CAPITAL TRADING GROUP LLC to include a beneficiary address of ███████, Bronx, New York 10473, a bank account number, which ended in 1776, and a bank routing number. VICTIM #1 made one additional deposit into this same PACIFIC CAPITAL TRADING GROUP LLC account: a cashier's check April 13, 2020 for $82,000. The wire transfer was conducted from VICTIM #1's bank in Virginia to JP Morgan/Chase Bank in New York for the specific account of PACIFIC CAPITAL TRADING GROUP LLC ending in 1776. For the deposit, VICTIM #1 traveled to a JP Morgan/Chase Bank branch and deposited a cashier's check into the account.

For both the wire transfer and the deposit, VICTIM #1 updated ▬▬▬▬ using the Google Hangouts chat and sent receipts for both transactions once completed, also via Google Hangouts.

20. On August 25, 2021, as part of their investigation, a detective from the Fairfax County Police Department obtained a Subpoena Duces Tecum for all JP Morgan/Chase Bank accounts associated with PACIFIC CAPITAL TRADING GROUP LLC which was served via fax on September 2, 2020. JP Morgan/Chase Bank provided the requested records to Fairfax County Police Department on September 14, 2020. Included in those records were the following items:

- a signature card showing BRONI as the sole authorized user of the account ending in 1776 and that the account was opened by BRONI on February 26, 2020;
- a bank statement for the time period February 26, 2020 through February 28, 2020 showing the initial deposit to open the account was a check from Bank of America in the amount of $1,252.67 made out to RICHARD A. BRONI of ▬▬▬▬ ▬▬▬▬ Bronx, NY 10473-▬▬;
- a copy of a deposit slip and copy of the aforementioned check for $1,252.67;
- a bank statement for the time period February 29, 2020 through March 31, 2020 showing a wire transfer for $5,000 from VICTIM #1 on March 16, 2020;
- a bank statement for the time period April 1, 2020 through April 30, 2020 showing a deposit on April 13, 2020 in the amount of $82,000;
- A copy of a deposit slip and copy of a cashier's check with remitter VICTIM #1 in the amount of $82,000.

21. On March 7, 2021, FBI Agents conducted separate non-custodial interviews of BRONI and MBIMADONG at LaGuardia Airport in Queens, New York after they were

returning from a vacation in Jamaica. During that interview, BRONI stated he was the sole owner and operator of PACIFIC CAPITAL TRADING GROUP LLC. BRONI stated PACIFIC CAPITAL TRADING GROUP LLC was used to conduct the business of buying cars for customers and arranging those cars being shipped to Ghana. BRONI stated he remembered the $82,000 deposit from VICTIM #1 due to issues BRONI encountered with JP Morgan/Chase Bank after its deposit. BRONI initially said that VICTIM #1 was a client that ordered three vehicles with the $82,000: a 2017 Range Rover Sport, a 2013 Mercedes C250, and a 2016 Toyota Corolla. Twice during the interview BRONI was advised of Title 18 U.S.C. §1001, which prohibits providing false statements to law enforcement officers. After being advised the second time, BRONI requested to start the interview over because he had not been telling the FBI Agents the truth.

22.     BRONI then told FBI Agents he had two friends in Ghana, CO-CONSPIRATOR #2 and CO-CONSPIRATOR #3, who tell BRONI when to expect money into his PACIFIC CAPITAL TRADING GROUP LLC bank account. After money is deposited into BRONI's PACIFIC CAPITAL TRADING GROUP LLC bank account, either CO-CONSPIRATOR #2 or CO-CONSPIRATOR #3 instructed BRONI where to send the money. BRONI said he sent money via wire transfer to purchase cars, or BRONI transferred money to individuals or other businesses. According to BRONI, all movement of money into and from PACIFIC CAPITAL TRADING GROUP LLC was at the direction of CO-CONSPIRATOR #2 and CO-CONSPIRATOR #3.

23.     BRONI stated he initially thought he was conducting legitimate business until JP Morgan/Chase Bank contacted him regarding the $82,000 deposit from VICTIM #1. BRONI said he closed down the PACIFIC CAPITAL TRADING GROUP LLC bank account after

finding out what the bank account was being used for may be illegal. BRONI also stated he was no longer conducting business with CO-CONSPIRATOR #2 and CO-CONSPIRATOR #3.

24. At the conclusion of the non-custodial interview on March 7, 2021, BRONI gave FBI Agents possession of his cellular telephone and signed a Consent to Search form allowing FBI Agents to search the contents of his cellular telephone.

25. On March 16, 2021, FBI Agents met with BRONI to return his cellular telephone and conduct another non-custodial interview. During this interview, BRONI admitted to providing false statements to FBI Agents on March 7, 2021, specifically stating he provided FBI Agents with a fictitious name for CO-CONSPIRATOR #3. BRONI was again reminded of Title 18 U.S.C. §1001 regarding providing false statements to law enforcement officers.

26. During the non-custodial interview on March 16, 2021, BRONI advised he was working with CO-CONSPIRATOR #2 and CO-CONSPIRATOR #4 who are located in Ghana. BRONI stated CO-CONSPIRATOR #2 and CO-CONSPIRATOR #4 knew about his aspirations to have a car business and provided BRONI a check worth approximately $1,200 to start a company. BRONI used an internet search to find the name PACIFIC CAPITAL TRADING GROUP LLC and used the $1,200 check he received from CO-CONSPIRATOR #2 and CO-CONSPIRATOR #4 to open the bank account at JP Morgan/Chase Bank in the name of PACIFIC CAPITAL TRADING GROUP LLC.

27. BRONI said either CO-CONSPIRATOR #2 or CO-CONSPIRATOR #4 would contact him via WhatsApp advising BRONI of when money would be deposited into the PACIFIC CAPITAL TRADING GROUP LLC bank account at JP Morgan/Chase Bank. Once the money was deposited into the bank account, BRONI would then receive instructions from either CO-CONSPIRATOR #2 or CO-CONSPIRATOR #4 regarding where to send the money.

28. BRONI advised at the beginning of these events, he believed his actions were legal. BRONI advised around July 2020 he realized the activity he was involved in was illegal with CO-CONPIRATOR #2 and CO-CONSPIRATOR #4; however, BRONI continued with conducting illegal activities because the money was good. JP Morgan/Chase Bank closed BRONI's bank account due to suspicions of illegal activities. BRONI estimated he profited $30,000 from this activity.

29. On April 19, 2021, Agents from the FBI conducted another non-custodial interview with BRONI. BRONI was again reminded of Title 18 U.S.C. § 1001, which prohibits individuals from provided false statements to federal law enforcement officers.

30. During this non-custodial interview, BRONI stated he had been conducting business as described previously with CO-CONSPIRATOR #2, CO-CONSPIRATOR #4, and others known and unknown to this investigation up until the first custodial interview with FBI Agents on March 7, 2021. BRONI admitted to having ownership and control of other companies other than PACIFIC CAPITAL TRADING GROUP LLC. Those other companies, as well as PACIFIC CAPITAL TRADING GROUP LLC, were receiving money BRONI knew to be from fraudulent activity such as romance scams.

31. During this non-custodial interview, BRONI told FBI Agents he started using his personal Bank of America bank account to receive money obtained from romance scams, and other fraudulent activity, in December 2019. BRONI was working with CO-CONSPIRATOR #5 who told BRONI the money he would receive into his Bank of America bank account was from scam victims. CO-CONSPIRATOR #5 gave BRONI instructions as to when to expect money and then where to send the money after it was deposited into his account. For his involvement in

this activity, BRONI was paid between 5% and 10% of the money deposited into his bank account.

32.     After Bank of America closed BRONI's personal account, Bank of America provided BRONI with a check for the remaining funds in the account.  BRONI confirmed the check he received from Bank of America was the same check used to open PACIFIC CAPITAL TRADING GROUP LLC mentioned in paragraph 20.  CO-CONSPIRATOR #5 instructed BRONI to open a business account in the name of PACIFIC CAPITAL TRADING GROUP LLC in order to be able to receive higher dollar amounts and multiple deposits from various sources without alerting the banks to suspicious activity.

33.     BRONI ended his business relationship with CO-CONSPIRATOR #5 shortly after opening the JP Morgan/Chase Bank account for PACIFIC CAPITAL TRADING GROUP LLC and began working with CO-CONSPIRATOR #2 and CO-CONSPIRATOR #4 conducting the same activity; receiving money obtained from romance scams and other fraudulent activity. While working with CO-CONSPIRATOR #2 and CO-CONSPIRATOR #4, BRONI kept 10% of all money received into the PACIFIC CAPITAL TRADING GROUP LLC bank account at JP Morgan/Chase Bank to include 10% of the money received from VICTIM #1.

34.     During his interview with FBI Agents on April 19, 2021, BRONI confirmed he engaged in marriage fraud by marrying MBIMADONG's sister, Individual P.M., in order to obtain his green card so he can work and reside with MBIMADONG in the United States. BRONI advised that MBIMADONG had returned to the United States about a week or two ago. MBIMADONG was originally scheduled to return to the United States on May 9, 2021; however, MBIMBADONG returned earlier than expected to address a business matter.

35.     During MBIMBADONG's interview on March 7, 2021 at LaGuardia Airport.  An FBI Agent advised MBIMADONG of Title 18 U.S.C. § 1001, and stressed the importance to MBIMADONG of being truthful throughout the interview.  MBIMBADONG acknowledged she understood the importance of being truthful and understood the adverse consequences of providing any false statements to law enforcement. MBIMADONG stated she and BRONI were best friends and roommates. MBIMADONG stated she was born in Ghana and became a citizen of the United States in 2018.  MBIMADONG has been residing at ▓▓▓▓▓▓▓▓▓▓▓▓ The Bronx, New York since 2008.  MBIMADONG stated she owns a shipping business called FAST TRACE that is also operated from ▓▓▓▓▓▓▓▓▓▓▓▓ The Bronx, New York.  According to MBIMADONG, BRONI has been residing with MBIMADONG at ▓▓▓▓▓▓▓▓▓▓▓▓ The Bronx, New York since August of 2018 or August of 2019.  MBIMADONG also stated she owns a retail grocery store called ▓▓▓▓▓▓▓▓ in East Legon, Ghana.  MBIMADONG planned to leave the United States on March 18, 2021 for business with ▓▓▓▓▓▓▓▓ and to return to the United States on May 9, 2021. In fact, she returned early.

36.     On April 21, 2021, MBIMADONG was interviewed by FBI Agents in Teaneck, New Jersey.  Throughout the interview FBI Agents stressed the importance to MBIMADONG of telling the truth.  MBIMADONG admitted to her participation in a criminal enterprise originating in Ghana that engages in several scams to include romance scams targeting individuals in the United States for approximately the last year.  MBIMADONG accepted funds from victims of the romance scam then laundered the money from the United States to Ghana through an elaborate network of channels.  After a caller in Ghana convinces a victim in the United States to send funds, bank accounts are needed in the United States to deposit and transfer

the funds ultimately to Ghana. In order to facilitate the transfer of funds from the United States to Ghana, MBIMADONG has opened several bank accounts in the United States under various company names to accept funds from victims or has found individuals located in the United States willing to accept funds from victims in the United States for a fee. MBIMADONG told FBI Agents she had instructed an individual to open a bank account in the name of PACIFIC CAPITAL TRADING, in order to collect funds sent to BRONI after PACIFIC CAPITAL TRADING GROUP LLC's bank account was closed. Once the victim funds have been deposited into these bank accounts, the funds are wired by MBIMADONG to purchase supplies from companies located in China that are shipped to individuals/businesses located in Ghana. Individuals in Ghana then purchase the supplies from MBIMADONG and deposit the money into her Ghanaian bank accounts. MBIMADONG has relationships with corrupt bankers for her bank accounts in Ghana that negotiate and agree on a conversion rate from United States dollars to Ghanaian cedi when payment is received for the supplies. After the money is converted to cedis, the corrupt bankers drop off the money at ▮▮▮▮▮▮▮▮▮ which is then picked up by the individuals responsible for initiating the calls to the victims of the romance scam. MBIMADONG receives 10% of all the romance scam proceeds received in her bank accounts for moving the funds from the United States to Ghana. MBIMADONG estimated she has received $250,000 to date from scams. MBIMADONG has used the $250,000 to perform renovations at ▮▮▮▮▮▮▮▮▮ and to pay the three-year lease of $72,000 for ▮▮▮▮▮▮▮▮▮.

    37. At the conclusion of the interview, MBIMADONG informed FBI Agents that she had to deliver $70,000 cash to CO-CONSPIRATOR #6 on April 23, 2021 (Friday) in Laurel, Maryland before returning to Ghana on April 27, 2021 (Tuesday). The $70,000 cash proceeds

were from a VICTIM #2 in a romance scam. MBIMADONG showed FBI Agents a photograph on her telephone of a cashier's check in the amount of $79,370 from VICTIM #2 from Chase Bank dated April 13, 2021. MBIMADONG advised the cashier's check was going to be sent to her from VICTIM #2 via FedEx or UPS. MBIMADDONG agreed to provide the tracking number for the FedEx or UPS parcel containing the cashier's check from VICTIM #2 to the FBI Agents as soon as she was provided the tracking number.

38.     On April 21, 2021, an FBI Agent conducted database in CLEAR and learned VICTIM #2 is a 74-year-old female residing in Englewood, Colorado. FBI Agents subsequently interviewed VICTIM #2 in Englewood, Colorado. VICTIM #2 had been scammed by three different men in a romance scam that ultimately persuaded her to send a cashier's check for $79,300 made payable to MBIMADONG on April 13, 2021 to ▓▓▓▓▓▓▓▓▓▓▓▓ Bronx, New York. VICTIM #2 showed FBI Agents a copy of the cashier's check made payable to MBIMADONG. VICTIM #2 also advised the FBI Agents that the cashier's check had been cashed.

39.     The tracking number for the parcel sent by VICTIM #2 was entered into USPS on-line portal by an FBI Agent to determine the status of the parcel sent by Victim #2. Per the USPS on-line portal, the parcel was delivered on April 14, 2021 at 4:09PM to Bronx, New York.

40.     I have reason to believe that MBIMADONG has already cashed the check and likely possesses the funds at issue.

41.     On April 22, 2021, an FBI Agent spoke to MBIMADONG. MBIMADONG advised that she has still has not received the cashier's check nor the tracking number for the parcel containing the cashier's check. MBIMADONG assured the FBI Agent the cashier's check is still coming to her as the cashier's check will be in her name; therefore, MBIMADONG will

have to cash the cashier's check in-order to deliver the check to CO-CONSPIRATOR #6. The FBI Agent requested MBIMADONG to send him a copy of the cashier's check from VICTIM #2 that she had shown to FBI Agents on April 21, 2021. MBIMADONG texted the FBI Agent the following message: "If you reroute it that's fine. I don't mind but please I don't want any issues at all. I called to get the tracking they said they will send it to me and I will forward it. If you can intercept it .. that's fine but please I don't want it to get to close to me." MBIMADONG never sent the photograph of the cashier's check from VICTIM #2 to the FBI.

## CONCLUSION

42. Based on the above facts, I submit that there is probable cause to believe that BRONI and MBIMADONG conspired to commit wire fraud (18 U.S.C. § 1343), mail fraud (18 U.S.C. § 1341), money laundering (18 U.S.C. §§ 1956, 1957), and to make false statements to law enforcement officers (18 U.S.C. § 1001), all in violation of Title 18, United States Code, Section 371, in the Eastern District of Virginia, and elsewhere.

## REQUEST TO SUBMIT COMPLAINT VIA ELECTRONIC OR TELEPHONIC MEANS

43. I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Criminal Complaint and Arrest Warrants. I submit that Assistant United States Attorney Russell L. Carlberg, an attorney for the United States, can identify my voice and telephone number for the Court.

Respectfully submitted,

Christopher Drew Truslow
Special Agent
Federal Bureau of Investigation

15

Attested to in accordance with the requirements of Fed. R. Crim. P. 4.1 via telephone on April 23, 2021.

Digitally signed by Michael S. Nachmanoff
Date: 2021.04.23 11:34:23 -04'00'

Hon. Michael S. Nachmanoff
United States Magistrate Judge